**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CLYDE PETERSON, | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. DLB-24-3582 |
| PRIMECARE MEDICAL INC., *et al.*, | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Clyde Peterson, who is proceeding without counsel and who at all times relevant to this action was a pretrial detainee at Charles County Detention Center ("CCDC"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against PrimeCare Medical, Inc. ("PrimeCare"), Zachary Rottman, M.D., Erlande PierreSaint, FNP, Teresa Beddow, AA, Ceirra Reynolds, RN, and Kari White, LPN for failing to provide appropriate medical care and against Correctional Officer Grant Evitts and Sgt. Sean Craig for interference with prescribed medical care.[1] All defendants have moved for dismissal or for summary judgment. ECF 16, 24, 27 & 28. Beddow, PierreSaint, Reynolds, Dr. Rottman, and White have filed a motion to seal. ECF 29. Peterson opposes the dispositive motions, requests appointment of counsel, and seeks discovery. ECF 21, 37, 42, *see also* ECF 1-11 at 70 (request for counsel). Peterson also has filed motions for extension of time, ECF 18 & 34, for leave to amend, ECF 19, for leave to file a surreply, ECF 32, and for default judgment, ECF 36.

No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For following reasons, Craig and Evitts's motion, treated in part as a motion to dismiss and in part as a motion for summary

---

[1] Peterson is currently incarcerated in Eastern Correctional Institution.

judgment, is granted in part and denied in part. PrimeCare's motion to dismiss is granted. PierreSaint and Dr. Rottman's dispositive motion, treated in part as a motion to dismiss and in part as a motion for summary judgment, is granted in part and denied in part. Beddow, Reynolds, and White's dispositive motion, treated in part as a motion to dismiss and in part as a motion for summary judgment, is granted in part and denied in part. Beddow, PierreSaint, Reynolds, Dr. Rottman, and White's motion to seal is denied. Peterson's motion for default and for leave to file a surreply are denied, his motion for leave to amend is denied as moot, and his motions for extension of time are granted nunc pro tunc. Peterson's individual-capacity deliberate indifference claims against Craig, PierreSaint, Beddow, Reynolds, and White survive and will proceed to discovery. To prosecute these claims, Peterson will have the benefit of counsel. His request for appointment of counsel is granted.

## I.    Background

The following is from Peterson's complaint and the exhibits he has attached to his complaint, which are part of the complaint for all purposes. *See* Fed. R. Civ. P. 10(c).

On October 19, 2021, Peterson was detained at CCDC. ECF 1, at 4. At that time, he was recovering from a right knee injury sustained on July 13, 2021, and he was wearing a hinged leg brace that had been prescribed by his orthopedic surgeon, Dr. Adams. *Id*. Peterson had undergone one surgery to his knee and required a second surgery. *Id.* at 5.

On October 20, 2021, Peterson was interviewed by PierreSaint. *Id.* During this interview, Peterson informed PierreSaint that he was scheduled to receive a second surgery on his knee on November 2, 2021. *Id*. PierreSaint told Peterson that her bosses and CCDC officials would have to give their approval for Dr. Adams to perform the second procedure. *Id*. Before the interview

ended, Peterson told PierreSaint that the condition of his knee limited his daily life and caused him pain. *Id*.

That same day, Peterson was seen by Dr. Rottman. Peterson repeated what he had told PierreSaint. *Id*. at 5–6; *see also* ECF 1-11, at 9.

On November 5, 2021, PierreSaint made an entry in Peterson's medical record confirming that a second surgery was supposed to take place to Peterson's right knee "after he had an internal fixation of his right patella" following a gunshot wound and attempted physical therapy. ECF 1-11, at 9. PierreSaint noted that an ice pack would be ordered and that she would contact Peterson's surgeon's office for "significance of surgery." *Id*. A medical record states: "Pt also inform that brace was not medically necessary per his MD." *Id.*

PierreSaint spoke with Dr. Adams on December 1, 2021. ECF 1, at 6. Dr. Adams informed her that the second surgery Peterson required could not be delayed "due to stiffness that will get worse in time[.]" *Id*.; *see also* ECF 1-11, at 15 (note entry dated December 1, 2021 documenting PierreSaint's conversation with Dr. Adams).

On December 16, 2021, Peterson was transported to Washington Hospital Center in Washington, D.C., to receive the second surgery to his right knee. ECF 1, at 6–7. Peterson describes this surgery as "irrigation and debridement with [open reduction & internal fixation] of right patella arthroscopic lysis of adhesions and manipulation under anesthesia[.]" *Id.* at 7. After the surgery, the post-operative nurse provided transportation officers with discharge paperwork and handwritten post-operative instructions from Dr. Adams which included: "physical therapy starting 12/17 for aggressive knee [range of motion]." *Id*.; *see also* ECF 1-1, at 3 (discharge instructions).

Once Peterson returned to CCDC, the transportation officers gave the medical paperwork to the attending nurse. ECF 1, at 7. The following day, Peterson began asking PrimeCare

employees about his prescribed knee brace and why he had not yet started physical therapy. *Id*. at 7–8. Each time Peterson asked about physical therapy his questions were either ignored or he was told it was being scheduled. *Id*. at 8. While waiting to start physical therapy, Peterson "started trying [daily] exercises" on his own accord. *Id.* Nevertheless, as the delay continued, Peterson's knee began to stiffen. *Id.*

On December 21, 2021, Peterson met with PierreSaint to talk about his knee and to change the dressing for his wound. *Id.* at 11. During this appointment, Peterson asked PierreSaint about physical therapy and she responded that "Teresa [Beddow] was scheduling it." *Id*. Peterson did not know who Beddow was at that time, but each time he brought up physical therapy her name was mentioned. *Id*.

On January 10, 2022, Peterson was taken to Washington Hospital Center for his first follow-up visit with Dr. Adams. *Id.* at 19. Beddow scheduled this appointment. *Id.* at 11. Two officers escorted Peterson to his appointment, one of whom was Evitts. *Id*. at 19. When Dr. Adams learned that Peterson had not started physical therapy yet, he asked why; Peterson responded that it was still being scheduled. *Id.* Dr. Adams "emphasized the importance of physical therapy" and gave Peterson some simple exercises to perform on his own while he waited for therapy to begin. *Id*. Dr. Adams prepared a physician's report, which he sent back with Peterson to CCDC. ECF 1-2, at 1. The report states that Peterson "needs aggressive [physical therapy] for [range of motion], quad strengthening," indicates that Peterson's incisions are healed, and recommends a follow up in six weeks. *Id.*; *see also* ECF 1-3, at 1 (final report stating that "lack of physical therapy" for over three weeks after surgery has "certainly set [Peterson] back."). Before Peterson left, Dr. Adams told him to continue using his hinged knee brace because it would help him walk and relieve pain. ECF 1, at 19. Dr. Adams also told Peterson that he no longer needed to have wound

dressing or an ace bandage since the surgical incision had healed. *Id.* Dr. Adams never spoke with the transport officers about Peterson's condition or his need, or lack thereof, for a brace. *Id*. at 19–20.

When Peterson arrived back at CCDC with the transport officers, he was escorted back to the medical department where Evitts gave Dr. Adams's report to Beddow. *Id*. at 20. Evitts told Beddow that "the doctor said he doesn't need the knee brace anymore." *Id*.; *see also* ECF 1-11, at 12 (medical record note by Beddow dated January 10, 2022 confirming that Evitts reported that the surgeon said the knee brace was no longer needed). Peterson attempted to correct what Evitts was saying and asked Beddow and Evitts to read the report or to call Dr. Adams to confirm that he did not say he no longer needed the brace, but Beddow and Evitts ignored him. ECF 1, at 20. Peterson's knee brace was confiscated. *Id.* at 12.

The following day, Peterson saw PierreSaint again. *Id.* at 11. He told her that Dr. Adams had asked why he had not started physical therapy yet. *Id.* Peterson explained to PierreSaint that Dr. Adams had stressed that he needed to be working with a physical therapist. *Id*. at 12. Peterson told PierreSaint that Dr. Adams had given him some alternative exercises to do until he started physical therapy. *Id*. PierreSaint responded that she needed to "double check with Teresa." *Id*. Peterson also told PierreSaint that he was in pain because his hinged knee brace was improperly confiscated the day before. *Id.* Peterson asked PierreSaint if she had read Dr. Adams's report. *Id*. She told him she had. *Id.* Peterson then asked where in the report it stated that the brace was no longer needed. *Id*. PierreSaint did not directly answer the question but said that she would call Dr. Adams. *Id*. Peterson told PierreSaint that Dr. Adams had told him that he no longer needed the wound dressing and the ace bandage because the surgical incision had healed, but "this made no sense to her." *Id*.

On January 18, 2022, Peterson again met with PierreSaint and complained about not going to physical therapy and his continued need for the return of his knee brace. *Id.* at 12–13. At this point, Peterson began to believe that his medical needs were intentionally being ignored and that PrimeCare staff were disregarding Dr. Adams's instructions. *Id*. at 13. Peterson again asked PierreSaint again about the physical therapy he was supposed be receiving and she again told him that "Teresa is scheduling it." *Id*. Peterson replied that other detainees who had not even had surgery were being taken to physical therapy, but PierreSaint did not respond. *Id*. Peterson asked twice if he could have his knee brace back while he waited for PierreSaint to talk to Dr. Adams. *Id.* PierreSaint responded, "I can't." *Id.*; *see also* ECF 1-11 at 8. Peterson had now been denied his brace for eight days. ECF 1, at 14. Peterson told PierreSaint that his knee was starting to stiffen up again. *Id.*

On January 27, 2022, a nurse working for Dr. Adams sent a letter to CCDC indicating that Peterson could wear his brace "at night as needed for pain." *Id.* at 22; *see also* ECF 1-5 at 1 (letter from Carolyn D. Tadiarca, RN). Reynolds, the head administrative nurse at CCDC who "over saw [sic] the nurses and medical files," came to the medical unit where Peterson was housed and returned his knee brace. ECF 1, at 22. Peterson asked Reynolds about his physical therapy. *Id.* Reynolds replied, "you were suppose[d] to have physical therapy? I have to check with Teresa." *Id.* Peterson told Reynolds that Dr. Adams had instructed that he receive physical therapy and that all she needed to do was check his discharge and follow-up visit instructions. *Id*. at 22–23. Reynolds left and never addressed Peterson's concerns regarding the delay in receiving physical therapy. *Id*. at 23.

Peterson eventually had another follow-up visit with Dr. Adams. *Id.* at 14. During this visit, Dr. Adams expressed disappointment that Peterson had not yet started physical therapy. *Id.* Dr.

6

Adams stated that he could not "understand why they approved [Peterson] to have the surgery if they were not going to provide the routine care after[.]" *Id.* When Peterson responded that "they continue to say [physical therapy] is being scheduled," Dr. Adams replied that it made "no sense to bring [Peterson] all the way to D.C. to see [him]" when CCDC medical personnel had not "followed [Dr. Adams's] instructions to date." *Id.* at 14–15. Dr. Adams told Peterson to continue doing individual exercises but that he needed to engage in "formal physical therapy." *Id.* at 15.

On March 1, 2022, Peterson again met with PierreSaint. *Id.* at 14. Peterson told PierreSaint about the follow-up visit with Dr. Adams and how disappointed Dr. Adams was that Peterson had not yet started physical therapy. *Id.* at 14–15. Peterson again asked PierreSaint about physical therapy and this time, instead of telling him that it was being scheduled, she told him that he was "supposed to do exercises on [his] own[.]" *Id.* at 15. Peterson objected, telling PierreSaint that he had asked her about physical therapy every time they had met and that up until this point, she had always said that it was being scheduled. *Id.* at 15–16. He also told her that Dr. Adams had repeatedly sent CCDC written instructions that he needed physical therapy. *Id.* at 16. At this point, Peterson was in chronic pain on the right side of his body between his hip and foot. *Id.*

On August 2, 2022, Peterson met with Dr. Rottman and complained that he was having headaches and was grinding his teeth in his sleep. *Id.* at 29. Peterson told Dr. Rottman that he attributed his headaches and teeth grinding to pain in his knee, right hip, and lower back, as well as to poor circulation in his right foot. *Id.* Peterson also explained to Dr. Rottman that he was not receiving physical therapy despite Dr. Adams's orders and that he was getting "the run around" from nursing staff. *Id.* Dr. Rottman took notes during this appointment and did not acknowledge Peterson's complaints, but did approve him for a mouth guard. *Id.* at 30. During this appointment,

Peterson saw Dr. Rottman put a note in the computer indicating that he had a "normal gait," which Peterson states "couldn't be farther from the truth." *Id.* at 33.

On August 11, 2022, Peterson met with PierreSaint for a prescheduled asthma check-up. *Id.* at 16. During this appointment, PierreSaint told Peterson that medical personnel and CCDC administrative staff wanted to move him out of the medical unit. *Id.* Peterson asked PierreSaint about his physical therapy, and she replied, "you want to go to physical therapy?" *Id.* at 17. Peterson responded, "you can't be serious, I have asked you about physical therapy since I came back from surgery in December and Dr. Adams has sent written instructions on different occasions that I needed physical therapy[.]" *Id.* PierreSaint again stated that she would have to talk to Teresa and a doctor employed by PrimeCare. *Id.* Peterson replied, "you have said this before." *Id.*

On August 29, 2022, White and Craig came to Peterson's housing unit and presented him with a new knee brace "to replace [Peterson's] medically approved hinged knee brace." *Id.* at 25. The new brace was too small for Peterson's knee and had a "rubber donut-like cushion" that covered the kneecap. *Id.* Peterson explains that this cushion would aggravate his pain because his knee was very sensitive and contained a screw. *Id.* Peterson objected and told White and Craig that the new brace would make his pain worse, was too small, and would not give him necessary support. *Id.* at 25–26. White and Craig told Peterson that it was "either the new brace or nothing[.]" *Id.* at 25. They then took away Peterson's medically-approved brace "without any consultation before hand [sic]." *Id.* at 26. Peterson states that no doctor had asked White and Craig "to make this change[,] nor was an evaluation conducted by the medical staff that would make these decisions to see what would be the appropriate change[,] if any." *Id.* By taking away his medically-approved brace, White and Craig made Peterson's condition worse. *Id.*

The next day, Peterson saw Dr. Rottman regarding his knee. *Id.* at 28. An LPN named Fatu Turay was present during this appointment.[2] *Id.* at 30. During the appointment, Dr. Rottman did not appear to be aware that the nurses had decided to confiscate Peterson's hinged knee brace without first consulting with him or Dr. Adams. *Id*. Dr. Rottman also was unaware that Peterson had not yet received physical therapy. *Id*. Dr. Rottman asked Turay who had made the decision to take away Peterson's knee brace. *Id.* Turay gave an evasive response. *Id.* Dr. Rottman then asked Turay when Peterson last saw Dr. Adams or when someone from the medical department had last consulted Dr. Adams. *Id.* Turay responded that a transport officer had reported that Dr. Adams said he no longer needed to see Peterson. *Id*. at 30–31. Dr. Rottman then asked Turay for the physician's report that Dr. Adams had filled out after Peterson's last visit. *Id.* at 31. Turay replied that Beddow had the report, and Dr. Rottman sent Turay to retrieve it. *Id.* After Turay left, Peterson told Dr. Rottman that Dr. Adams never said he didn't need to see him again. *Id*. Rather, Dr. Adams had stated that he did not know what to do because the lack of physical therapy was impeding Peterson's recovery. *Id*.

Turay eventually returned to Dr. Rottman's office with Beddow. *Id.* Dr. Rottman asked Beddow why Peterson had not seen Dr. Adams again. *Id.* at 32. Beddow said that the transportation officer had stated that Dr. Adams did not need to see Peterson anymore. *Id*. Dr. Rottman then asked Beddow for the physician's report. *Id.* Dr. Rottman read the report and then asked Beddow to point out where in the report it stated that Peterson no longer needed to see Dr. Adams. *Id*. Beddow had no answer. *Id*. at 32–33. At the end of this appointment, Dr. Rottman told Beddow and Turay to

---

[2] Peterson sometimes refers to Turay as a "defendant" in the body of his complaint, but the Court presumes that this is a scrivener's error because Peterson has not listed Turay as a defendant in the case caption and has not sought to amend his complaint to add Turay as a defendant.

return Peterson's hinged knee brace, stated that he was going to call Dr. Adams, and scheduled Peterson for physical therapy. *Id*. at 33.

It was not until ten months after his knee surgery, in September 2022, that Peterson was taken to physical therapy. *Id.* at 9. By this point, however, "it was too late." *Id*. The physical therapist told Peterson that "with the type of surgery [he] had [he was] suppose[d] to start physical therapy right after the surgery, which was routine." *Id.* at 38.

On December 10, 2024, Peterson filed this lawsuit. He states that as of filing the suit, he "still ha[s] chronic pain in [his] right knee, [his] right hip and lower back has continued to get worse . . . and [his] right foot blood circulation is poor whenever [he] tr[ies] to sleep, sit down, or use the bathroom." *Id.* at 9. He sues all defendants in their individual and official capacities. He accuses them of violating his Fourteenth Amendment rights.[3] He seeks compensatory and punitive damages as well as declaratory relief.

On May 9, 2025, Evitts and Craig filed a motion to dismiss or, in the alternative, for summary judgment, ECF 16, which is fully briefed, ECF 16-1, 21, & 23.[4] PrimeCare filed a motion

---

[3] In his complaint, Peterson identifies the Eighth Amendment as the basis for his claims. Because Peterson was a pretrial detainee at the time of the events alleged in his complaint, the Fourteenth Amendment, not the Eighth Amendment, governs his claims. *See Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). In their dispositive motion, Craig and Evitts argue that Peterson's claims should be dismissed because he has identified the incorrect constitutional amendment as the basis for his lawsuit. ECF 16-1, at 7. Peterson subsequently filed a motion for leave to amend his complaint to identify the Fourteenth Amendment as the basis for his claims. ECF 19. This motion is fully briefed. ECF 20 & 22. Because Peterson is pro se, the Court liberally construes his original complaint to assert his claims under the Fourteenth, rather than the Eighth, Amendment. Thus, the motion for leave to amend is denied as moot, and the Court will not dismiss Peterson's claims for failure to identify the correct constitutional amendment.

[4] Peterson has sought leave to file a surreply to Craig and Evitts's dispositive motion. ECF 32. Craig and Evitts oppose the motion. ECF 33. Surreplies are disfavored. *See Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013). "Surreplies, however, 'may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply.'" *Medish v. Johns Hopkins Health Sys. Corp.*, 272 F. Supp. 3d 719, 722 (D. Md. 2017) (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003)).

to dismiss on July 16, 2025. ECF 24. On July 19, 2025, PierreSaint, Dr. Rottman, Beddow, Reynolds, and White filed motions to dismiss or, in the alternative, for summary judgment. ECF 27 (PierreSaint & Dr. Rottman mot.) & 28 (Beddow, Reynolds, & White mot.).[5] Peterson filed an omnibus opposition to PrimeCare, PierreSaint, Dr. Rottman, Beddow, Reynolds, and White's motions on September 19, 2025. ECF 42.[6]

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim

---

Craig and Evitts did not raise any new matters in their reply. Peterson's motion for leave to file a surreply is denied.

[5] Peterson has filed a motion for default judgment against Beddow, Reynolds, White, and Dr. Rottman. ECF 36. Beddow, Reynolds, White, and Dr. Rottman oppose the motion. ECF 38. Under Fed. R. Civ. P. 55(a), default may be entered "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." The failure to plead or defend does not automatically entitle a plaintiff to entry of default judgment. The decision to enter default is left to the discretion of this Court. *See Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002). Entry of default judgment is not favored and is reserved for cases where the adversary process has been halted by an unresponsive party. *See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993). The adversary process has not been halted here. The motion for default judgment is denied.

In addition, PierreSaint, Dr. Rottman, Beddow, Reynolds, and White have filed a motion to seal the medical records they have attached to their dispositive motions, citing the need to protect Peterson's personal identifying information and privacy. ECF 29. However, many of these records are already on the public docket because Peterson himself filed them. The motion to seal is denied with instructions to counsel to redact Peterson's date of birth and social security number if either appears anywhere in the records.

[6] Peterson filed motions for extensions of time to respond to the defendants' dispositive motions. ECF 18 & 34. Those extension motions are unopposed. The Court grants them, nunc pro tunc, and deems Peterson's oppositions timely filed.

11

is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents

integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

Peterson does not have counsel. "[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020). But "liberal construction does not require [the court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (quoting *King*, 825 F.3d at 214).

Several defendants seek summary judgment as alternative relief. The Court notified Peterson that he had the right to respond to their motions, that the motions could be construed as motions for summary judgment, and that if Peterson did not file a timely and adequate written response to each motion, the Court could enter judgment against him without providing him another opportunity to respond. ECF 17, 30, 31. Moreover, the motions, which identify summary judgment as possible relief, provided sufficient notice for Peterson to have a reasonable opportunity to present relevant evidence or to notify the Court that he needed an opportunity for discovery before fully responding to the motion. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); Fed. R. Civ. P. 56(d). The Court is satisfied that Peterson has been advised that the motions could be treated as motions for summary judgment and he has had a reasonable opportunity to present relevant evidence or to notify the Court that he needed an

13

opportunity for discovery before fully responding to the motion. The Court will resolve the motions, in part, under Rule 56.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 252. The court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (citing *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on a motion for summary judgment, the court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

14

**III.    Discussion**

The United States Code provides a federal cause of action for any individual who believes a state actor has deprived them of a constitutional right. *See* 42 U.S.C. § 1983; *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). The statute "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Two elements are essential to state a claim under § 1983: (1) the plaintiff must have suffered a deprivation of "rights, privileges or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation must have been "committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 45 n.3, 48 (1988) (quoting 42 U.S.C. § 1983).

Peterson accuses the defendants of deliberate indifference in violation of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment affords pretrial detainees the right to receive adequate medical care. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating that "the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care" to pretrial detainees "who require it") (citation omitted)). "To state a claim of deliberate indifference to a medical need," a pretrial detainee must plausibly allege that

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).

15

**A.      Official Capacity Claims**

Peterson sues all individual defendants in their official capacities.[7] An official-capacity suit "generally represent[s] only another way of pleading an action against an entity of which [the] officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). A plaintiff suing a defendant in their official capacity must allege that "the entity's 'policy or custom'. . . played a part in the violation of federal law." *Id.* at 165–66 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Peterson does not plausibly allege that any of the individual defendants' actions were taken pursuant to a "policy or custom" of either PrimeCare or CCDC. Thus, all official capacity claims against the individual defendants are dismissed without prejudice. The remainder of this opinion addresses Peterson's individual capacity claims.

**B.      Exhaustion of Administrative Remedies**

Evitts and Craig argue that they are entitled to dismissal of Peterson's claims against them and summary judgment because Peterson failed to exhaust his administrative remedies.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The phrase "prison conditions" encompasses "all inmate [and pretrial detainee] suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003).

---

[7] Peterson also purports to sue PrimeCare in its "individual and official capacity." The Court resolves the claim against PrimeCare in part III.C.

16

Exhaustion under § 1997e(a) is mandatory. A plaintiff must exhaust their available administrative remedies before this Court will hear their claim. *See Ross v. Blake*, 578 U.S. 632, 639 (2016); *Jones v. Bock*, 549 U.S. 199, 215–16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005). Consequently, if Peterson has not properly presented any of his claims through an available administrative remedy procedure, that claim must be dismissed pursuant to the PLRA. *See Ross*, 578 U.S. at 639. Administrative exhaustion under § 1997e(a) is not, however, a jurisdictional requirement and does not impose a heightened pleading requirement on the detainee. *Jones*, 549 U.S. at 215–16. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See id.*; *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). The Court may dismiss a claim on this ground only if "the defendants raise the issue as an affirmative defense and the [detainee] has had an opportunity to respond to the affirmative defense" or in "the rare, exceptional instance where administrative exhaustion"— or lack thereof—is "apparent on the complaint's face." *Custis*, 851 F.3d at 362 (citing *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008)).

To properly exhaust administrative remedies, an inmate must complete "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006); *Moore*, 517 F.3d at 725. Under this requirement, an inmate must use "all steps that the agency holds out, and [do] so *properly* (so that the agency addresses the issues on the merits)." *Woodford*, 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). A court will not dismiss a claim as unexhausted "if a prisoner, through no fault of his own, was prevented from availing himself of [an administrative remedy]." *Moore*, 517 F.3d at 725. Nor must a detainee name particular defendants in the grievance if the applicable grievance procedure does not require him to do so, so long as the grievance allows

the facility in which he is confined "to address complaints about the program it administers before being subjected to suit[.]" *Id.* at 726 (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a); *see Ross*, 578 U.S. at 635–36. The Court will not grant the defendants summary judgment on an exhaustion defense "if a prisoner, through no fault of his own, was prevented from availing himself of [an administrative remedy]." *Moore*, 517 F.3d at 725. "The Supreme Court has identified certain circumstances in which an official grievance policy is not 'capable of use' in this sense," including "situations in which officials 'thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Moss v. Harwood*, 19 F.4th 614, 621 (4th Cir. 2021) (quoting *Ross*, 578 U.S. at 644).

Here, the evidence submitted by Craig and Evitts establishes that CCDC has a four-step grievance process. ECF 16-5, at 3. First, a detainee should raise concerns with a supervisor. *Id.* Second, if that does not resolve their concern, the detainee must complete an inmate request form that "explain[s] [their] concern in detail, and describe[s] [their] efforts to resolve the issue." *Id.* Third, once they receive a response to the inmate request form (which must occur within five business days), they may be given the option to file a grievance, which they must do within five days by completing and returning the appropriate form. *Id.* Finally, once they receive a response (which must occur within seven business days), they may appeal to the director within three business days. *Id.* The policy does not state what happens if the detainee does not receive a response to their inmate request form or their grievance or if they are not given the option to file a grievance. The policy does not require that detainees name the CCDC personnel responsible for their alleged injuries. The policy states that "[i]f you fail to follow these steps, you will not have exhausted your administrative remedies." *Id.* at 4.

The record reveals that Peterson filed an inmate request on August 30, 2022. That request is addressed to "Captain Dixon," and reads:

> Capt. Dixon; I need security video confirmation from January 2022 until present of me exercising my knee. I saw the Doctor today and the nurses tried to switch blame on me concerning the poor condition of my knee. As prescribed by the operating orthopedic surgeon I was suppose[d] to start aggressive physical therapy after my surgery back in December 2021. Medical was made aware of this several times by myself and the surgeon. Today the Doctor was unaware of the poor condition of my knee and that the nurses took my knee brace and replaced it with a brace that is harmful and inefficient. He recommended I get the original brace back and told me I was scheduled for physical therapy. Can you please confirm this with the Doctor here? You can also get confirmation from various officers here at CCDC during this time-frame that they have witnessed my daily exercises.

ECF 1-11, at 1. A notation at the bottom indicates that Captain Dixon forwarded the letter to "medical" on August 31, 2022. *Id.*

Craig and Evitts make two arguments as to why they are entitled to dismissal and/or summary judgment on failure-to-exhaust grounds. The Court limits its consideration to those arguments. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (discussing principle of party presentation). First, Craig and Evitts argue that the claims against them should be dismissed because Peterson failed to allege that he pursued the remaining steps necessary to exhaust his remedies after filing his request. But Peterson was not required to so allege. *See Moore*, 517 F.3d at 725. Nor is this one of the "rare, exceptional" instances where an exhaustion defense can be adjudicated on the face of the complaint. *Custis*, 851 F.3d at 362.

Second, Craig and Evitts seek summary judgment, arguing that Peterson's request was insufficient because it does not mention them or "challenge their alleged actions." ECF 16-1, at 6. The mere fact that Peterson's request did not mention Craig and Evitts by name is not dispositive because CCDC policy does not require detainees to name the individuals responsible for their injuries when filing an inmate request. *See Moore*, 517 F.3d at 726 (prisoner not required to name

defendants in grievance where grievance policy did not require him to do so). Moreover, even though Peterson does not specify that Craig was involved, his request describes the incident in which his medically-approved knee brace was confiscated and replaced. His request provided CCDC with sufficient information to investigate his complaint and identify the officers involved. Craig has not shown that he is entitled to summary judgment on Peterson's claim against him for failure to exhaust administrative remedies.

The analysis is different, however, as to Evitts. Nowhere in Peterson's request did he describe the incident he now complains of in this lawsuit: Evitts falsely telling Beddow that Dr. Adams had discontinued the brace. Peterson thus failed to follow all necessary steps to exhaust his administrative remedies as to Evitts per the procedure prescribed by CCDC because he failed to describe his complaint against Evitts in any detail. Evitts is entitled to summary judgment because Peterson failed to exhaust his administrative remedies against him. The Court will dismiss Peterson's claim against Evitts without prejudice to Peterson's right to bring that claim in a new civil action if he first exhausts it. *See Moss v. Harwood*, 19 F.4th 614, 623 & n.3 (4th Cir. 2021) (affirming grant of summary judgment and dismissal without prejudice for failure to exhaust and noting it was "consistent with precedent" to grant summary judgment yet dismiss without prejudice if the claims might later be exhausted).

### C.    Craig

Craig argues that Peterson fails to state a claim against him for deliberate indifference under the Fourteenth Amendment. The Court disagrees. Peterson alleges that he had an objectively serious medical condition—a knee injury--and required a prescribed brace to provide his knee with adequate support. He further alleges that, without consulting with Peterson's doctor and over Peterson's protestations, Craig took this brace from him and replaced it with one that was too small

20

and made his pain worse. This is sufficient to allege that Craig acted knowingly or recklessly in the face of a serious risk of harm that Craig should have known about and that Craig caused harm to Peterson as a result.

Craig also argues that he is entitled to summary judgment. He argues that he lacked the authority to provide Peterson medical care and claims that, as a nonmedical professional, he was entitled to rely on White's judgment in determining that Peterson no longer needed the brace. Craig has submitted an affidavit in which he states that, when he accompanied White to Peterson's cell, his "only role was to provide security, not to determine what knee brace [Peterson] would wear" and that "the Detention Center" relies on PrimeCare's judgment and assessment to address detainees' complaints about their medical care. ECF 16-3, at 3. Craig adds that as a correctional officer, he lacks "the authority to make any decisions . . . concerning the appropriate medical care for an inmate." *Id.* at 2. Craig also contends that he is entitled to qualified immunity for the same reasons. ECF 16-1, at 10.

In his opposition to Craig and Evitts's motion, Peterson argues that summary judgment on his claim against Craig would be premature because he has not yet had the opportunity to engage in discovery. The Court understands Peterson to be invoking Rule 56(d) of the Federal Rules of Civil Procedure, which allows a district court to defer summary judgment to allow for discovery when a nonmovant shows that they "cannot present facts essential to justify [their] opposition[.]" A party invoking Rule 56(d)'s protections ordinarily must submit a Rule 56(d) declaration setting forth their reasons for opposition. *Evans*, 80 F.3d at 961. Even without a Rule 56(d) declaration, the court may consider whether the nonmoving party "adequately informed the [ ] court that the motion [for summary judgment] is [premature] and more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). The Fourth Circuit has

21

emphasized that discovery is "broadly favored" before granting summary judgment and district courts are to afford pro se plaintiffs leniency in regard to the requirements of Rule 56(d). *See, e.g.*, *Farabee v. Gardella*, 131 F.4th 185, 193–95 (4th Cir. 2025). Relief under Rule 56(d) should be "liberally granted," especially "in the context of pro se litigation," *Jenkins v. Woodard*, 109 F.4th 242, 251 (4th Cir. 2024) (citing *Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021)), "when a case involves complex factual questions about intent and motive," or "the relevant facts are exclusively in the control of the opposing party," *Harrods Ltd.*, 302 F.3d at 247 (quoting 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Fed. Prac. & Proc.* § 2741, at 419 (3d ed. 1998) ("Wright & Miller")).

Peterson asserts that security footage will show that, when Craig and White came to his cell, Peterson attempted to explain to White that he could not use the replacement brace, but instead of letting him explain himself to White, Craig cut him off and demanded that he give up his prescribed brace. ECF 21, at 13–14. Peterson also claims that discovery will allow him to learn who authorized Craig and White to take his brace from him. *Id.* at 15. Craig is correct that nonmedical correctional personnel are generally entitled to defer to the opinions of medical personnel. *See, e.g.*, *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) ("supervisory prison officials are entitled to rely on [the] professional judgment of trained medical personnel") (citing *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990), *overruled on other grounds by Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124 (4th Cir. 2020)). However, discovery will reveal whether Craig was merely acting in reliance on the opinions of White or other medical officials or whether he was in fact acting on his own initiative and/or on the orders of nonmedical CCDC personnel. Peterson has adequately informed the Court that Craig's request for summary judgment is premature. Given these "complex factual questions about intent and motive," *Harrods Ltd.*, 302 F.3d at 247 (quoting

22

Wright & Miller § 2741), the Court denies summary judgment on Peterson's Fourteenth Amendment claim against Craig.

That Craig has asserted a qualified immunity defense does not change the Court's analysis. In adjudicating a qualified immunity defense, the Court must consider "first, whether the facts viewed in [Peterson's] favor make out a violation of his . . . constitutional rights, and second, whether that violated right was clearly established at the time." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). Peterson bears the burden of proof on the first prong, and Craig bears the burden of proof on the second prong. *Id.* To be sure, "when a plaintiff files a Rule 56(d) request in opposition to a dispositive motion by a defendant who has asserted qualified immunity, the plaintiff's burden is 'somewhat elevated . . . because officials have a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery.'" *Gardner v. United States*, 184 F. Supp. 3d 175, 185 (D. Md. 2016) (quoting *Gomez v. Martin*, 593 F. App'x 756, 760 (10th Cir. 2014)). But Peterson has satisfied the Court that discovery is warranted. Craig has not argued that any right he may have violated was not clearly established. Thus, Craig has failed to meet his burden on the second prong of the qualified immunity test. And, as discussed above, Peterson has forecast that discovery on the first prong—namely, whether Craig violated his Fourteenth Amendment rights—is necessary for him to oppose summary judgment. Adjudicating Craig's qualified immunity defense at this stage is premature.

Craig's request to dismiss the Fourteenth Amendment claim against him is denied. His motion for summary judgment on the Fourteenth Amendment claim is denied.

23

### D.      PrimeCare

PrimeCare asserts that the claim against it should be dismissed because Peterson has not alleged the existence of a corporate policy or custom that has resulted in a violation of his constitutional rights.

A private corporation that acts on behalf of a state actor, such as PrimeCare, may be found liable under a *Monell* theory of liability under limited circumstances. *See Monell*, 436 U.S. at 690 (municipal liability under § 1983); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (liability of a private corporation under § 1983). To state a *Monell* claim against a private corporation acting under color of state law, the plaintiff must "identify a . . . 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). A policy or custom may be established in any of four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). An entity "may not be held liable under § 1983 solely because it employs a tortfeasor," and the court will not impose liability "under a theory of *respondeat superior*." *Bd. of Cnty. Comm'rs*, 520 U.S. at 403 (citing *Monell*, 436 U.S. at 694); *see Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982) (noting that liability of a private corporation under § 1983/*Monell*, like local government liability under § 1983/*Monell*, requires more than *respondeat superior*).

Peterson accuses PrimeCare of "repeatedly ignoring their own policy of employee review and audit of patient care" and "let[ting] their employees make decisions and prescriber care outside of their purview and knowledge." ECF 1, at 37–38. These conclusory allegations do not plausibly

24

allege the existence of a company-wide policy or practice that caused Peterson's injuries. Peterson also contends that PrimeCare should be held "liable for each of its employee[s'] illicit actions[]when they don't uphold company policy." *Id.* at 37. But the mere fact that PrimeCare employs the people who harmed Peterson is not a basis for holding PrimeCare liable under § 1983. Because Peterson fails to plausibly allege that his injuries resulted from a PrimeCare policy or custom, his claim against PrimeCare must be dismissed without prejudice.

### E.    Dr. Rottman

Dr. Rottman argues that Peterson's claims against him should be dismissed for failure to state a claim. The Court agrees.

Most of Peterson's allegations against Dr. Rottman suggest that Dr. Rottman acted with the opposite of deliberate indifference. On Peterson's account, Dr. Rottman challenged Beddow and Turay when he learned that Peterson's brace had been confiscated, ordered them to return the brace to him, and ensured that Peterson finally received the physical therapy that had been so long delayed. Peterson otherwise alleges that, during an earlier appointment, Dr. Rottman incorrectly noted that his gait was normal. But without more details, the Court cannot plausibly infer that Dr. Rottman's entry of this note into Peterson's medical record impacted the type or promptness of the treatment Peterson received.

Peterson's claim against Dr. Rottman is dismissed without prejudice.

### F.    PierreSaint, Reynolds, Beddow, and White

PierreSaint, Reynolds, Beddow, and White argue that Peterson fails to state a claim against them.

Peterson plausibly alleges that PierreSaint violated his Fourteenth Amendment rights. He alleges that he had a serious knee injury that, if not properly treated, could cause substantial harm.

25

He further plausibly alleges that PierreSaint, despite knowing that Peterson's doctor had ordered physical therapy, delayed and deflected his requests for physical therapy for months—at first by repeatedly telling him it was being scheduled, then by telling him he simply needed to do exercises on his own, and eventually by feigning ignorance that he had ever asked about it. And he alleges that as a result of this delay in receiving medically necessary treatment, the condition of his knee deteriorated and physical therapy became nonviable as a treatment option. These allegations plausibly suggest that PierreSaint knowingly failed to act to address a substantial risk of serious harm of which she was or should reasonably have been aware and that her inaction caused Peterson serious harm.

Peterson also plausibly alleges that Reynolds violated his Fourteenth Amendment rights. A supervisory employee such as Reynolds may be found liable only if the plaintiff shows that the official "acted personally in the deprivation of the plaintiff['s] rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)). To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must plausibly allege that (1) the supervisor had "actual or constructive knowledge" that a subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Peterson alleges that he spoke directly to Reynolds, a head administrative nurse, about his need for physical therapy. He further alleges that he urged her to look at his medical records to verify that he had been ordered to receive physical therapy. And he alleges that, although Reynolds told him she would look into the matter, he never heard from her again and continued to experience difficulties obtaining physical therapy after he spoke to her. At this stage, these allegations are sufficient to raise a plausible inference that Reynolds was aware that her subordinates were not providing Peterson physical therapy, that she responded with deliberate indifference or tacit authorization to this information, and that if she had taken action, Peterson would have received physical therapy.

Peterson also plausibly alleges that Beddow and White violated his Fourteenth Amendment rights. He alleges that he had a medically-prescribed brace that supported his knee and alleviated his pain. He further alleges that Beddow relied on the word of Evitts, a correctional officer who was not a medical professional, to conclude that he did not require this brace any longer, even though Beddow had in hand a report from Peterson's orthopedic surgeon that said nothing about Peterson no longer needing the brace. Peterson also alleges that White later confiscated his brace again without consulting with his doctor. These allegations suggest that, in taking away his brace, Beddow and White acted recklessly in the face of a risk of harm to Peterson about which they should have known. And Peterson plausibly alleges that not being able to use his prescribed brace caused him pain and worsened the condition of his knee.

Peterson has alleged sufficient facts to state a Fourteenth Amendment claim against PierreSaint, Reynolds, Beddow, and White.

PierreSaint, Reynolds, Beddow, and White argue, in the alternative, that they are entitled to summary judgment on Peterson's Fourteenth Amendment claim. In conclusory fashion, they

27

assert that Peterson "received consistent and comprehensive care for his right knee . . . and that medical personnel communicated with . . . Dr. Adams[]regarding his care and reviewed Dr. Adams'[s] records to get a better understanding of his problems." ECF 27-1, at 14; ECF 28-1, at 11. They also contend that the medical records do not support Peterson's account. *See, e.g.*, ECF 28-1, at 10–11, ECF 27-1, at 13. Beddow further argues that when she took away Peterson's brace she did so "in good faith based on information provided by detention center personnel[.]" ECF 28-1, at 11. PierreSaint contends that there is no evidence that she had the "ability or authority to make a decision regarding whether or not [Peterson] required formal physical therapy" and that the medical records do not support Peterson's account of events. ECF 27-1, at 13. Reynolds states that she "adopt[s]" PierreSaint's arguments on this issue. ECF 28-1, at 12 n.1. White, for her part, argues that there is no evidence that she was responsible for the decision to take Peterson's brace and that she was really attempting to help him when she did so. ECF 28-1, at 10.

In response, Peterson argues that his medical records are incomplete and unreliable and that the defendants are not credible. *See, e.g.*, ECF 42, at 10, 23–24. Throughout his opposition, he urges that discovery will allow him to marshal more evidence to support his account and demonstrate that there are genuine disputes of material fact precluding summary judgment. *See, e.g., id.* at 10, 13, 23, 33. Peterson also has filed a "motion for discovery" making substantially the same arguments, which the Court construes as a Rule 56(d) request. ECF 37. For instance, Peterson claims that in discovery, he will be able to obtain evidence that White was not authorized to take his knee brace. Peterson insists that that if Dr. Adams is deposed, he will be able to shed light on his communications with CCDC staff and explain what he told them about Peterson's medical care. *Id.* at 6–8. Peterson contends that without such discovery, summary judgment is premature. ECF 42, at 23.

28

Although Peterson has not submitted a formal Rule 56(d) declaration, the Court affords him leniency as to this requirement, in light of his pro se status. By repeatedly emphasizing the need for discovery and by specifying that he needs specific forms of discovery such as depositions and interrogatories to fully address the defendants' claims, Peterson has "adequately informed the [ ] court" that granting summary judgment to PierreSaint, Reynolds, Beddow, and White would be premature. *Harrods Ltd.*, 302 F.3d at 244. Thus, insofar as PierreSaint, Reynolds, Beddow, and White seek summary judgment on the current record, the Court denies their motions.

## G.      Request for Counsel

Peterson requests that the Court appoint counsel. In civil cases, a federal district court judge has the discretion under 28 U.S.C. § 1915(e)(1) to appoint counsel, but only if an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). "Courts consider 'the type and complexity of the case,' whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim." *Giddings v. Montgomery Cnty.*, No. GJH-21-959, 2021 WL 5921382, at *1 (D. Md. Dec. 15, 2021) (quoting *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989)), *aff'd*, No. 22-6057, 2022 WL 1284296 (4th Cir. Apr. 29, 2022).

This case warrants appointment of counsel. Peterson has colorable claims against several defendants. He has skillfully prosecuted this suit thus far, submitting well-written and often persuasive filings that accurately cite relevant caselaw and use it to his advantage. However, this case is proceeding with discovery. Discovery likely will involve depositions of medical professionals and analysis of medical records. It will be difficult for Peterson, who is not a lawyer

29

and is currently incarcerated, to engage in this process without the assistance of counsel. The Court appoints counsel to represent Peterson in this matter.

## IV.    Conclusion

For the foregoing reasons, Craig and Evitts's dispositive motion, treated in part as a motion to dismiss and in part as a motion for summary judgment, is granted in part and denied in part. PrimeCare's motion to dismiss is granted. PierreSaint and Dr. Rottman's dispositive motion, treated in part as a motion to dismiss and in part as a motion for summary judgment, is granted in part and denied in part. Beddow, Reynolds, and White's dispositive motion, treated in part as a motion to dismiss and in part as a motion for summary judgment, is granted in part and denied in part. The motion for leave to amend is denied as moot. The motion to seal, motion for default judgment, and motion for leave to file a surreply are denied. Peterson's motions for extension of time are granted nunc pro tunc.

Peterson's individual-capacity deliberate indifference claims against Craig, PierreSaint, Beddow, Reynolds, and White will proceed to discovery. Peterson's request for appointment of counsel is granted.

A separate Order follows.


Date: March 31, 2026                                _____
                                                    Deborah L. Boardman
                                                    United States District Judge

30